(84 South. 216)

No. 23815.

STATE v. GUAGLIARDO et al.

(April 5, 1920.)

On Motion to Remand.

*(Syllabus by Editorial Staff.)*

1. CRIMINAL LAW ☞1134(3)—CASE CANNOT BE REMANDED ON SUGGESTION THAT A WITNESS HAS REPUDIATED TESTIMONY.

In view of the absence of any law conferring upon Supreme Court authority to hear evidence in appealed cases, and Const. art. 85, which in criminal cases confines its jurisdiction to "questions of law alone," the Supreme Court cannot consider defendant's motion to remand on the suggestion that a witness upon whose testimony the conviction was based has repudiated or desires to repudiate such testimony, as the fact so set up can be laid before the board of pardons and the Governor, who have authority and facilities for inquiring into and acting thereon.

On the Merits.

*(Syllabus by the Court.)*

2. WITNESSES ☞203—WITHHOLDING STATEMENT OF EYEWITNESS TO MURDER AFTER DEMAND THEREFOR BY ACCUSED GROUND FOR REVERSAL.

A statement of the circumstances of a murder by a supposed eyewitness (who becomes the most important witness in the prosecution), which is reduced to writing by an attorney voluntarily associated with the prosecuting officer, and is in their possession, is accorded no such privilege against disclosure as that it can be withheld when called for and needed by the person charged with the murder for the purposes of his defense, and the withholding is good ground for reversal of the conviction of such defendant.

3. CRIMINAL LAW ☞706, 1144(10)—FAILURE OF PROSECUTING OFFICER TO PRODUCE ANNOUNCED EVIDENCE TENDING TO IMPEACH DEFENDANT GROUND FOR REVERSAL.

In attempting to lay the foundation for the impeachment of a defendant on trial for murder, who has taken the stand as a witness in his own behalf, the prosecuting officer, in attributing to him statements which if shown and believed to have been made by him would be highly prejudicial to his defense, should act in good faith and with reasonable grounds for believing that he will be able to produce the evidence called for by the questions propounded by him and the announcements of his intention to impeach; and where, in several instances in the same cross-examinations, he not only fails to produce such evidence but offers none whatever, the presumption is a fair one that he had none to offer, and the conviction will be set aside.

Appeal from Twenty-Eighth Judicial District Court, Parish of Jefferson; John E. Fleury, Judge.

Frank Guagliardo, alias Frank Jordano, and Iorlando Guagliardo, alias Jordano, were convicted of murder, and the former was sentenced to death and the latter to life imprisonment, and they appeal. Motion to remand on suggestion that a witness had repudiated his testimony denied, and convictions and sentences annulled, and cause remanded to the district court for trial anew.

Wm. H. Byrnes, Jr., and A. T. Higgins, both of New Orleans, and Andrew H. Thalheim, of Gretna, for appellants.

A. V. Coco, Atty. Gen., and L. Robert Rivarde, Dist. Atty., of Hahnville (T. S. Walmsley, of New Orleans, of counsel), for the State.

On Motion to Remand.

MONROE, C. J. Defendants were prosecuted under an indictment for murder; Frank Guagliardo, having been found guilty as charged, was sentenced to death, and Iorlando Guagliardo, having been found "guilty without capital punishment," was sentenced to imprisonment at hard labor for life. They have both appealed. The transcript contains many bills of exception reserved by their counsel during the progress of the trial, comparatively few of which are insisted upon in this court. All of the testimony taken on the trial was reduced to writing, made part of the bills and of the statements per curiam thereto attached, and has been copied in the transcript. For the purposes of a motion to remand, filed on behalf of defendants, as also

in order to avoid repetition and facilitate a better understanding of the bills as hereafter considered, we make the following general statement of the case as disclosed by the transcript, to wit:

The defendants are father and son; the father (Iorlando Guagliardo) having been about 66 years of age at the time of the murder, and the son a few months past the age of 17, though weighing 275 pounds, and a powerful youth. The father is an illiterate Italian; the son a native of this state, with an incomplete common school education; the name "Jordano" has been adopted by the family, instead of Guagliardo, because of the difficulty experienced by the people with whom they came in contact in pronouncing and spelling the name last mentioned, which, however, they continue to use in business transactions of a more formal character. At some time prior to the homicide here in question the elder Guagliardo and his wife and daughter were keeping a small retail grocery on premises owned by them in Gretna, but, concluding to retire from that business, had rented the premises to Charles Cortimiglia, a native of this state, who, with his wife, Rosie Cortimiglia, took over the business. Thereafter the Guagliardos decided to resume their business, and requested the Cortimiglias to vacate their premises, which request was followed by an action for and their ejection, under a judgment of court, the severance of friendly relations, the acquisition by the Cortimiglias of a place of their own, and the establishment of their business in the immediate neighborhood. The Cortimiglias were young people (the wife being about 21 years of age in 1919), and were the parents of a little girl, aged about 21 months, who slept with them in a room adjoining their store, and who, notwithstanding the coolness between the families, continued to be a visitor at the home and store of the Guagliardos. On the morning of Sunday, March 9, 1919,

the Cortimiglias were found in their bed with their skulls crushed, or split; the child being dead, the mother totally unconscious, but breathing, and the father barely able to indicate that he desired his brother-in-law to be sent for. The mother and father were at once removed to the Charity Hospital, and after an inquest the child was buried. The cases of the patients sent to the hospital were regarded by the surgeons as hopeless, but they were given the benefit of immediate operations (craniotomy), and eventually recovered; Mrs. Cortimiglia having been discharged and having left the hospital not earlier than the 27th and not later than the 29th of March. There is conflict in the testimony as to her capacity, up to that time, to recall the circumstances under which she received her injury, but there is testimony to the effect that she made statements conflicting with each other as to the person by whom the injury was inflicted; and it is undisputed that upon the basis of one of the statements thus attributed to her the Guagliardos were arrested prior to the time at which she was discharged from the hospital, and upon May 5th following they were indicted for the murder of the child. Upon the trial of the case Mrs. Cortimiglia was the only witness who directly connected the defendants with the crime. She testified that she was awakened in the night by certain noises; that she saw the defendants in her room; that the younger seized her hands and held them; that the elder went out and brought in an ax; that he gave it to the younger one, who struck the child, then in her arms, three blows on the head with it; that he then struck her upon the head with it and she became unconscious; that her husband continued to sleep and that she made no effort to awaken him by screaming or otherwise; and she gave some other details. The verdict of conviction was brought in by the unanimous concurrence of

the 12 members constituting the jury. Upon the argument in this court it was brought to our attention, by a motion to remand filed on behalf of defendants, that since the conviction and the lodging of the appeal herein Mrs. Cortimiglia has repudiated the testimony given by her on the trial. The instrument purporting to contain that repudiation and to be signed by her and two witnesses reads, in part, as follows:

"I saw the Jordanos every day of my life and frequently spoke to them. I did not recognize them, either by their faces, figures, or voices as the men who killed my baby; but I said it was the Jordanos when I was on the witness stand because everybody kept saying to me that it was them, and because I remembered that the Jordanos had a fuss with my husband when we first moved to Second and Jefferson street in Gretna. I cannot sleep at night, and I have a headache all the time; and I do not want these people punished because of me, and therefore I have come to the Times-Picayune to make this statement so that they can publish it to the world, and so that any wrong that I may have done with my testimony will now be righted. I am going to the Gretna jail to-morrow and tell them that I did not know, and do not know, who killed my baby. St. Joseph came to me last night and said, 'Rosie, you cannot die with that boy's life and that old man's liberty on your conscience.'"

[1] The Attorney General, through his able assistant, calls attention to the fact that the instrument above quoted is unverified, and that it is framed in language not likely to have been used by Mrs. Cortimiglia; and though he does not deny that the statement therein contained has been made by her, or that the subscribing witnesses are reputable persons, he doubts whether, if called upon so to do, she would verify it by her oath. Our law confers upon this court no authority to hear evidence in appealed cases; and in criminal cases confines its jurisdiction to "questions of law alone." Const. art. 85. It is quite evident, too, that if the court could exceed the limit thus imposed upon its jurisdiction, and should entertain an application to remand a criminal case upon the suggestion that a witness upon whose testimony a conviction was based has repudiated, or desires to repudiate, such testimony, it would establish a precedent which, if followed, would lead to far-reaching consequences and most seriously interfere with the proper administration of criminal justice. The facts set out in the motion to remand can be laid before the board of pardons and the Governor, who are vested with authority and provided with facilities for inquiring into and acting upon such matters; and, as this court is not so equipped, the motion is denied.

On the Merits.

[2] I. Mrs. Cortimiglia was taken from the hospital by the chief of police of Gretna and a deputy sheriff, and carried to the parish jail, where she was kept for 24 hours, when she was allowed to go to her sister's, at Amesville. She testified that she had no recollection of having made any statement while at the hospital. She was asked:

"What did they tell you when they brought you to the jail?"

And her answer was:

"I was so nervous and so scared; they bringing me to the jail for nothing; I was so anxious and scared I could not say anything; I knew I was in there without doing anything."

Farther along in her examination she was asked how she occupied herself while in jail, and then whether she had made any statements while there, and she answered the question last mentioned by saying that she had made two statements; one to the district attorney, which was not reduced to writing, and another, later, to his assistant, which was reduced to writing, and to which she made oath. Defendants' counsel then called for the production of the written statement, and there were various objections which were sustained by the court; the latest, as

appears in the note of evidence, reading as follows:

"By the Court: The court is going to deny your motion, for the reason that the defense has no more right to call upon the state to present its evidence to the defense, for the purpose of impeaching or contradicting a witness, than the state has a right to call upon the defense to furnish it with a sworn statement, made by the accused to counsel for the defense, for the same purpose. For these reasons, the court is going to refuse your motion.

"By Mr. Byrnes (Defendants' Counsel): Your honor, please, I want to get it in the record that Mr. Gaudet (associated with the district attorney) refused to produce the statement called for and that the court refused to order them to produce the statement.

"The Court: Yes, sir; for the reasons stated.

"Mr. Byrnes: Then I will ask them if they will produce it (meaning the district attorney and his associate).

"The District Attorney: No, sir; we refuse to produce it because it is not a public record."

And the bill was reserved.

We shall not occupy time or space in the discussion of the question whether the statement called for was a public record, since we consider it immaterial. Nor need much be said of the reason upon which the trial judge based his ruling, since it is also immaterial whether the statement called for was regarded by the district attorney as the state's "evidence," or in some other light. As a matter of fact and law, it was a piece of substantive evidence concerning questions of vital importance in the defense of the two men who were on trial for their lives, and we know of nothing in the law or in reason which authorized the refusal to produce it. It is true that communications to a prosecuting officer by a prosecuting witness may be privileged against disclosure, but they are not necessarily so. There was a radical difference of opinion between the surgeons who testified in the case as to whether Mrs. Cortimiglia was then competent to make such statement; those upon the one side, including the house surgeon of the Charity Hospital (who performed the operation of craniotomy upon her within a few hours after she was injured, and attended her constantly until she was discharged from the hospital), being of the opinion that she was not so competent and had not been competent from the time of the injury, and those upon the other side, testifying as experts in surgery and psychiatry, testifying that she may have been competent. As we have heretofore noted, it is shown that, while in the hospital, at a time when she did not know that she was there, or that her baby had been killed, of which she testified on the trial that she did not know what she said or might have said, she made two conflicting statements as to the identity of the person or persons by whom she had been attacked, and it was upon the basis of one of those statements that defendants were arrested; and it was immediately after her discharge from the hospital, and while she was in the custody of the sheriff in jail, and "so scared," according to her testimony on the trial, that she could not say anything, that the statement here in question was elicited from her. Certainly the defendants had the right to show, by any procurable evidence as to what she had said and done, that up to that time she was incapable of remembering what had happened to her at the moment of, and immediately before, the attack whereby she was deprived of her senses, and had the right to submit all available information on that subject to the jury, to be considered in connection with the expert testimony, pro and con, upon the subject of her capacity to remember those things in testifying on the trial. It is not denied that the statement called for is in existence, or that it is in the possession of the prosecuting officer, and there can be no reason why it should not be produced unless it enjoys such a privilege that it can be withheld, though a human life may depend upon its production.

It is said that a confidential communication to a prosecuting officer by a prosecuting witness may be privileged. 40 Cyc. 2369. But according to Professor Wigmore, quoted in the same volume:

"Four fundamental conditions may be predicated as necessary to the establishment of a privilege against the disclosure of communications between persons standing in a given relation: (1) The communications must originate in a confidence that they will not be disclosed; (2) this element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties; (3) the relation must be one which in the opinion of the community ought to be sedulously fostered; and (4) the injury that would inure to the relation by the disclosure of the communication must be greater than the benefit thereby gained for the correct disposal of the litigation. A privilege should be recognized when these four conditions are present, but not otherwise." 40 Cyc. 2353, citing Wigmore on Ev. 2285.

In the case here presented we fail to recognize either of the conditions thus mentioned, and hence are of opinion that the statement called for should have been produced, and that there was reversible error in the ruling of the court of which defendants complain.

[3] II. During the cross-examination of the defendants the district attorney asked them certain questions which imputed to them highly prejudicial statements, as made to specified individuals at specified times and places, and, as laying the proper foundations for their impeachment in the event of their denying the statements, warned them of his intention to impeach them. In other instances the statements attributed to defendants concerned immaterial matters which had no particular bearing upon the case; the threat or assurance of impeachment being based merely upon the assumption that the statements or acts assumed to have been made or performed were at variance with the testimony given by defendants on the trial. The specific complaint which defendants make in their motion for new trial with regard to this feature of the case is that, after warning them of his intention to impeach the testimony elicited by his prejudicial questions, attributing to them statements to the effect that they intended to kill the Cortimiglias, and after calling before the jury and having identified the persons by whom the impeachments were to be effected, the district attorney did not thereafter call those persons to the stand, or otherwise attempt such impeachments; that his intention and questions following such announcements were not made in good faith, or with the bona fide intention to contradict defendants, but were made for the purpose of injuring them in the estimation of the jury. The application of defendants' complaints to the facts disclosed by the record will be better understood by the following, which appears in the cross-examination of the elder of the two defendants, to wit: The district attorney called before the jury one Ed Hanson, and, having had him identified by defendant as a person with whom he was acquainted, coupled with the statement, "I am asking this question for the purpose of impeaching and contradicting your testimony," asked defendant whether in the course of a conversation with Hanson, in which Hanson had mentioned the fact that the Cortimiglias were about setting up an opposition grocery, he (defendant) had said:

"The opposition don't worry me; I will get rid of them; I will kill them all."

The question was answered emphatically and indignantly in the negative, and Hanson was never recalled to contradict that answer.

On the cross-examination of the younger defendant, the district attorney asked whether he knew Rube Mayronne, and, being called on to state his purpose, said, "If he denies this question, I am going to try to impeach him;" and the defendant, having answered that he knew Mayronne, was asked

whether, about two weeks prior to the attack upon the Cortimiglias, he had asked Mayronne whether he had made a loan to them to enable them to build their store, and whether, upon receiving a reply in the negative, he had said, "That son of a bitch will not be here longer than two weeks;" to which question he answered that he had not made the statement in the sense attributed to it, but had said that the Cortimiglias would probably be ejected by judgment of court. Mayronne was not called to contradict that testimony.

On the same cross-examination the district attorney called one Fandel before the jury, and, having had him identified by defendant as a person whom he knew, asked defendant whether he had not, on the morning of March 9, 1919 (the day of the attack upon the Cortimiglias), between 9:30 and 10:30 o'clock, ridden in the car of which Fandel was conductor from Gretna to Algiers, to which defendant replied that he had not so ridden, whereupon, after some other questions, the district attorney gave the warning:

"I ask you this question again, and I intend to impeach your testimony on this particular point, and I want to place you on your guard and give you a chance to correct that statement."

And, the question being repeated, the answer was:

"No, sir; I did not get on any car that morning at all; I was home."

And no attempt was thereafter made to impeach its verity.

Later on in the cross-examination defendant was asked whether he had had a fight on the morning of the attack on the Cortimiglias, and his examination proceeded as follows:

"Q. Do you know this man Fandel that you looked at this morning, the conductor on the street railway? A. Yes, sir. Q. Did you not tell him that on Sunday morning, March 9th,

when you got in his car and paid your fare, and he asked you what was the matter with your hand, and you told him that you had had a fight with a fellow? A. No, sir; I didn't tell him that. Q. Was your hand scratched? A. No, sir; it was not scratched. Q. You deny making that statement to him? A. Yes, sir; I do. Q. Now, I wish you to think again; I am going to give you a chance. I am placing you on your guard, and I intend to impeach your testimony. Now, I ask you again to think, so you can have a chance to correct it. You are positive about it then, Frank? A. I did not have no fight Sunday morning. Q. You are positive you did not tell him that? A. I am positive. Q. You are positive that you did not tell Fandel, on Sunday morning, March 9th, at about 10 o'clock in the morning, when he asked you what was the matter with your hand, that you had a fight with somebody? A. I did not see Fandel Sunday morning; I did not see him in the street car; I did not tell him I had a fight, because I didn't have any fight that Sunday morning. Q. Did you go to Algiers that Sunday morning? A. I did not."

Fandel was not called to the stand, and no attempt was made to contradict the testimony so given.

Announcements of the intention to impeach were made with reference to immaterial matters, and, similarly, there was a failure to attempt to make good the announcement.

In the argument of the case counsel for defendants asked the district attorney why he had not called Hanson and Mayronne and Fandel to the stand to impeach the defendants, and, apparently making no answer as to Hanson, he gave the following as his reason for not attempting to impeach the testimony of Frank (Guagliardo) Jordano (quoting from his brief) to wit:

"I am now come to Frank Jordano, and my answer to the gentleman on the other side why I did not place the witness named by them on the stand to impeach Frank Jordano is because Frank Jordano stands impeached by his own testimony, for he testified here on the stand that he swore falsely under oath, before the coroner's jury, told a deliberate falsehood; and therefore I don't need to put witnesses on the stand to impeach Frank Jordano, because he is a perjurer, a self-confessed perjurer."

The district attorney did not on the trial, nor has he in his argument in this court, offered any explanation of his failure to put Hanson on the stand; nor did he on the trial, nor has he here, made any statement to the effect that he was misled as to what either of the persons mentioned would have testified to if called to the stand, and that he failed to call them because he learned, after he had made his announcements, that they would not support them. The reason assigned by him for not calling Mayronne and Fandel appears to us to be not only insufficient but as adding to the injury which the younger defendant had already sustained, since it was equivalent to saying to the jury, "I could have impeached him by the testimony of those men;" and the only reasonable presumption, we think, is that he could not so have impeached him.

Moreover, his reason was predicated upon the unwarranted and highly prejudicial statement that defendant was "a self-confessed perjurer"; the incident concerning which the perjury was assumed to have been committed having been utterly trivial and wholly immaterial to the proceeding in which it occurred. It appears that defendant's sweetheart had told him of a dream in which she saw a great many snakes, and that he, probably thinking that it was a bad omen, asked his mother about it, telling her that it was his sweetheart's dream, but that thereafter he mentioned it in giving his testimony before the coroner's jury, and then attributed the dream to himself. Subsequently he seems to have had some compunction on the subject, and he told the whole story to the chief of police. He says, in his testimony:

"I told my mother my sweetheart had the dream and I told Chief Leson, in jail, that I did wrong in telling the coroner's jury that (that it was he who had the dream), but I would correct it. I told him that the other day. Q. There was nothing wrong in telling the

146 LA.—31

coroner's jury that your sweetheart had that dream, was there? A. I didn't want to mention her name before gentlemen."

He was then compelled to admit that he had sworn falsely before the coroner's jury and that he knew that he was so doing. Nevertheless he was not "a self-confessed perjurer."

In Louisiana, so far as we are informed, it has never been the practice for prosecuting officers to outline in opening statements the facts upon which they expect to rely in order to secure convictions, nor for them at any stage of the proceedings, and whether directly or by indirection, to import into a case material facts which have not been established or attempted to be established by evidence; and here, as elsewhere, such action is regarded as good ground for the reversal of a conviction. State v. Thompson, 106 La. 365, 30 South. 895; City of Shawnee v. Sparks, 26 Okl. 665, 110 Pac. 884, L. R. A. 1918D, 1.

Where, on the trial of a criminal case, the prosecuting officer, having reasonable ground for believing that he will be able to contradict and impeach the testimony of an adverse witness, contemplates making the attempt, it is a well-recognized requirement of common fairness that the attention of the witness shall be specifically called to the time, place and person when, where and to whom the statement to be contradicted was made, though whether it is necessary to give specific notice of the intention to impeach is a question about which the courts are not altogether agreed. Hence, if as in this case, a defendant in a criminal prosecution takes the stand as a witness in his own behalf, and is to be regarded as any other witness, statements which (if it be shown and believed that he made them) may cost him his life, may be attributed to him in questions propounded for the ostensible and announced purpose of impeaching his veracity. It may

be that an intelligent jury would understand that the asking of such questions is not the equivalent of proving the statements which they carry, and that on the failure of such proof the defendant should stand unimpeached. On the other hand, it may happen that the jury is not intelligent, or, being intelligent, and perhaps knowing and respecting the district attorney, find it impossible to understand and difficult to believe that he would formally announce that he intended to show (and, inferentially, by a person whom he produces, and whom perhaps they also know and respect) that defendant had testified falsely, unless he had at least the assurance of the person produced that he would testify to that effect; and hence if he fails to offer such testimony, and gives as a reason for his failure, not that he was unable to do so, but that he considered it unnecessary, the jurors may be left with the impression that he could have made good his assurance had he so chosen, and particularly may that be true where, as in this case, the court gives the jury no instructions upon the subject.

"At common law," we read in a valuable work, "after the arraignment and impaneling of the jury, the outline of the indictment and pleadings were usually stated to the jury by the junior counsel, who was then followed by the senior counsel, who stated to them the circumstances expected to be proved (citing Chitty, Cr. L. 535). At the present time, the prosecuting attorney may generally, in opening his case to the jury, state fully the facts which he expects to prove. And it is not error for the prosecuting attorney in his opening address to state facts as he expects to prove them, although not followed by proof, because the facts themselves are irrelevant, or because he fails to introduce any evidence, or introduces incompetent evidence to support them."

To that statement of the law there is appended a note to the effect that—

"He (the prosecuting attorney) in stating the facts must have acted, however, in good faith and with reasonable grounds to suppose that he could prove the facts as stated."

And the decisions of the courts of last resort of several of our sister states are cited as supporting that doctrine (12 Cyc. 570, note 51); and we are of opinion that it should be applied in this case. We therefore conclude that there was reversible error in the refusal of the court to grant a new trial. There are other bills, quite a number of them; one or two perhaps well founded, but most of them otherwise. We, however, think it unnecessary to consider them. For the reasons thus assigned, it is adjudged and decreed that the convictions and sentences appealed from be annulled, and that this cause be remanded to the district court to be tried anew, according to law and to the views hereinabove expressed.